IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JENNIFER XU,

    Plaintiff,

v.                                           CASE NO. 1:09-cv-00187-MP-GRJ

BOARD OF TRUSTEES OF THE UNIVERSITY OF FLORIDA,

    Defendant.

_____/

### O R D E R

This matter is before the Court on Doc. 49, motion for summary judgment by defendant, Board of Trustees of the University of Florida (UF). In her Amended Complaint at Doc. 9, plaintiff, Jennifer Xu, claims both violations of gender discrimination and unlawful retaliation by UF through its Institute of Food and Agriculture Science Information Technology Unit (IFAS IT). UF argues that Xu has failed to produce evidence of any genuine issue of material fact as to either of her two claims. UF's motion for summary judgment is denied for the following reasons.

### I. BACKGROUND

Because this is a motion for summary judgment brought by UF, the following facts are set out in the light most favorable to Xu, the nonmoving party. *See Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739 (11th Cir. 1996). Xu is a college graduate holding both a Bachelor and Master's Degree in Electrical Engineering and Computer Science. Doc. 66, ¶ 7. On or around October 23, 1989, she began working for UF as a Senior Systems Programmer in what is now referred to as IFAS IT. Doc. 9, ¶ 6; Doc. 66, ¶ 4. In 1999, IFAS IT underwent a reorganization

during which Dr. Fedro Zazueta became the new Director of IFAS IT.  Doc. 66, ¶ 7.  In 2000, Chris Leopold, a male employee at IFAS IT who, prior to this reorganization, held a position hierarchically lower than Xu, was promoted to Systems Program Manager, a position above Xu. *Id.* Unlike Xu, Leopold did not hold any post-secondary degrees. Furthermore, he had not been employed with IFAS IT as long as Xu. Finally, the promotion came despite the previous Director's recommendation that Xu be given the position. *Id.* ¶ 8.

On March 15, 2000, Xu filed the first of several discrimination complaints.  This particular complaint was an internal complaint against Dr. Zazueta, which alleged gender discrimination in promoting Leopold to Systems Program Manager rather than Xu.  Several months later she alleged that, as a form of retaliation to her internal complaint, IFAS IT became a hostile work environment.  *Id.* ¶ 12.  Xu subsequently entered into a settlement agreement with UF whereby she was promoted to Systems Program Manager and given a raise.  After this settlement, IFAS IT was reorganized into two units: WAN and LAN.  Xu was tasked with managing WAN.  *Id.* ¶ 20.  Dr. Zazueta was then promoted and Dan Cromer stepped in as his replacement in 2001.  *Id.* ¶ 22.

Cromer knew that Xu had filed a complaint against Dr. Zazueta.  However, whether he knew the circumstances of the complaint is unclear.  *Id.* ¶ 23.  Regardless, under Cromer, Xu continued to experience what she perceived as gender discrimination when compared to IFAS IT's treatment of Leopold.  For example, after eleven days on the job, Cromer conducted annual job performance evaluations on both Xu and Leopold.  Xu scored "average" while Leopold scored an "exceed" rating, despite the filing of a sexual harassment complaint against Leopold. *Id.* ¶ 24.  In 2002, Cromer gave Xu the same score despite her receiving an award for innovation and increased productivity earlier that year from IFAS IT.  *Id.* ¶ 25 & n.5.  In the evaluation,

Cromer suggested that she "work on communication and coordination." Pl.'s Ex. 21.

Between 2002 and 2008, Cromer reassigned several of Xu's duties to Leopold. Doc. 66, ¶ 27. Cromer also excluded Xu from discussions concerning her and the WAN group while including Leopold in such discussions. Xu complained via letter about these actions to Dr. Michael V. Martin, Vice President of IFAS IT. Pl.'s Ex. 24. She also wrote an email to Cromer concerning the matter. Pl.'s Ex. 25.

In 2004, Xu's duties were further reduced as her access to WAN equipment was limited to "Read-Only" status. Doc. 66, ¶ 32. At the same time, Leopold was allowed to work with WAN equipment while Xu was barred from working with LAN eqiupment. *Id.* ¶ 33. In response, Xu again complained to Dr. Martin, alleging further gender discrimination. *Id.* ¶ 34. She also sent Cromer an email concerning the allegations. Her duties in the WAN group were subsequently restored. *Id.* ¶ 35.

Training and cellular telephone subsidies also proved contentious. From 2004 until Xu's termination, Leopold attended six training conferences paid for by UF, whereas Xu only attended one despite numerous pleas to Cromer for such opportunities. *Id.* ¶ 36. Likewise, Leopold was not only provided a Blackberry by Cromer years before Xu, he was given a monthly subsidy on the phone. Until she filed yet another discrimination complaint, no such subsidy was given to Xu. *Id.* ¶ 37.

In 2007, due to severe budget cuts throughout the University of Florida, IFAS IT was in talks with CNS, a unit within the University's Central IT Department, for a possible reorganization of the WAN and LAN groups. *Id.* ¶¶ 28, 39. While IFAS IT consulted Leopold several times during these talks concerning his knowledge of LAN technology, it never consulted Xu. In fact, Xu only learned about the potential reorganization in February 2008,

when Dr. Joe Joyce, UF's Associate Vice President, admitted to the discussions. *Id.* ¶ 39.

CNS provided IFAS IT with two proposals. *See* Def.'s Ex.'s 1 & 2. Under the original proposal, IFAS IT would transfer both the LAN and WAN divisions to CNS and save $20,000. Def.'s Ex. 1. However, under a revised proposal, CNS offered a $40,000 savings to IFAS IT upon the transfer of both divisions. Def.'s Ex. 2. After examining the revised proposal, IFAS IT discovered that transferring only the WAN division to CNS would also save $40,000. *Id.* IFAS IT chose this alternative and outsourced WAN alone, thereby saving $40,000 and retaining control over the LAN division. Dr. Joyce Dep. 20:12-21.

On February 29, 2008, Cromer issued Xu her yearly performance evaluation, in which he scored her with a rating of "Above Average." Pl.'s Ex. 1. Xu complained that the evaluation was an inaccurate reflection of her work and argued that she deserved a higher rating. *Id.* In a letter dated March 27, 2008, Xu formally raised these complaints. *Id.* While the letter raised no complaints of discrimination, Xu verbally complained to Cromer that the evaluation was the product of gender discrimination. Doc. 66 ¶ 44.

On May 5, 2008, Cromer notified Xu that UF would discontinue her employment effective June 30, 2008. Xu Dep. 20:6-8. By letter dated May 15, 2008, IFAS IT issued a written notice to Xu concerning her termination. *Id.* at 69:24-70:16, 72:5-15. The letter stated that her termination was due to budget cuts. *Id.* IFAS IT also terminated the employment of four male employees. *Id.* at 71:22-72:4. IFAS IT, however, retained Leopold. Doc. 66 ¶ 45.

Xu believes that, per UF's policies, IFAS IT should have terminated Leopold's employment prior to her termination. Xu had both seniority over and more retention points than

Leopold.[1]  Doc. 66 ¶ 46.  However, according to Aigi Adesogan, an employee relations manager with the University's human resources department, the retention points were irrelevant.  *Id.* ¶¶ 46, 49.  The seniority, on the other hand, raised flags with human resources.  The department conducted a review of her termination, part of which "was to ask how Jennifer Xu was chosen" instead of Leopold.  *Id.* ¶ 49.  The review required Cromer to explain his decision to terminate Xu's employment.  *Id.*

In his explanation, Cromer stated that Xu could not be trained within six months to perform Leopold's duties.  Essentially, while "she could have taken a course and learned part of the job . . . she could not have learned the whole job in six months."  Cromer Dep. 124:25-125:5.  Human resources took this justification at face value, without any further investigation.  *See* Adesogan's Dep. 18.  Xu, however, believes that, given her education and her experience with computer systems, she could have learned the job in six months.  Doc. 66 ¶¶ 51-53.  Moreover, Tom Hintz, former Director of IFAS IT and Xu's supervisor for ten years, stated that "six months is more than adequate time to learn the capability of that" job.  Hintz Dep. 13.

Upon Xu's termination, UF hired a male employee, James Moore, to perform Xu's WAN duties at CNS.  Pl.'s Ex. 33.  Xu learned of this job opening independently and applied for the position.  Doc. 66 ¶ 66.  Xu stated that she was willing to take a cut in salary for the job.  *Id.*  However, UF hired Moore over Xu.  *Id.*

On September 4, 2009, Xu filed the instant case against UF alleging employment discrimination and unlawful retaliation, both in violation of 42 U.S.C. § 2000e (2010).  Doc. 9.

---

[1]According to Xu, retention points "are points . . . accrued during one's employment with Defendant . . . based on a number of criteria such as job performance evaluation and years of service . . . ."  Doc. 66 ¶ 46 n.8.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (2010).  UF filed its Answer and Affirmative Defenses, Doc. 14, arguing, inter alia, that any alleged discriminatory or retaliatory conduct was the result of legitimate, non-discriminatory, non-retaliatory reasons.  *Id.*  After discovery, UF filed the instant motion for summary judgment arguing that Xu failed to produce sufficient evidence so as to create any genuine issue of material fact as to either of her claims.  Xu responded in opposition.  Doc. 67.

## II. SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate where "'a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a genuine issue of material fact exists.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The trial court "'must consider all the evidence in the light most favorable to the non-moving party.'"  *Id.* (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987)).  It must also "'resolve all reasonable doubts in favor of the non-moving party.'"  *Id.* (quoting *Barnes v. Southwest Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987)).  Essentially, "[i]f reasonable minds might differ on the inferences arising from the undisputed facts, then the court should deny summary judgment."  *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (quoting *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982)).

## III. DISCUSSION

Although the dispositive issues in the instant case concern whether there exist any

genuine issues of material fact as to either Xu's gender discrimination claim or her unlawful retaliation claim, UF demands that the Court limit its consideration of Xu's claims to only those factual matters which occurred in 2007 and 2008. UF argues that all allegations in Xu's Response from the years 2000 to 2004 are "new allegations." Doc. 80. Essentially, "the Complaint alleges disparate treatment that occurred in 2007 and 2008 whereas Plaintiff's Response relies on perceived mistreatment dating as far back as the year 2000." *Id.* According to UF, any allegations of gender discrimination or retaliation which did not occur in 2007 or 2008 should be considered "outside the scope of the Complaint" and, therein, outside the scope of Xu's cause of action. *Id.* In short, UF would have this Court ignore any factual matters prior to 2007. Thus, before considering whether there exist any genuine issues of material fact as to either of Xu's gender discrimination or unlawful retaliation claims, the Court must first determine the facts upon which Xu's claims are based.

Xu's claims consist of gender discrimination and unlawful retaliation. Doc. 9. In each of these claims, once the plaintiff establishes a prima facie case, the defendant is afforded the opportunity to articulate some legitimate, non-discriminatory, non-retaliatory reason for the adverse employment action. *See, e.g.*, *Walker v. Nations Bank of Fla. N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995) ; *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). The plaintiff then has the burden of rebutting this proffered reason by showing that it is merely pretext for discriminatory intent. *See, e.g.*, *id*.

In showing that the reason behind an employment decision is merely pretext for discrimination, the plaintiff may succeed "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Moreover, the plaintiff may use circumstantial evidence "not directly related to the

employment decision [to] contribute to a circumstantial showing of discriminatory intent." *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002). For example, where a historically good employee suddenly begins "receiving poor evaluations when a new supervisor [comes] on," a jury may infer discriminatory animus. *Id.* The same is true where "male employees with employment histories like the plaintiff's were not subject to the same adverse employment action as the plaintiff." *Id.* In other words, the plaintiff may use past employment practices as circumstantial evidence of discriminatory animus. Thus, the plaintiff may use those same historical practices to show that the employer's proffered explanation is unworthy of credence.

      While Xu's Amended Complaint, Doc. 9, raises allegations dating only as far back as 2007, she may, nonetheless, support her claims for both gender discrimination and unlawful retaliation with past employment practices tending to show discriminatory intent. Moreover, in the Amended Complaint, Xu suggests this where she states generally that "[d]uring Plaintiff's employment with Defendant, she was treated differently and adversely due to her gender, female." Doc. 9 ¶ 7. Likewise, when referencing specific instances of discrimination occurring in 2007 and 2008, she notes that such instances are alleged "[b]y way of example only." Thus, any evidence of past employment practices tending to show discriminatory intent is admissible. However, for purposes of this Order, the Court will not consider such evidence.[2] The Court, in its evaluation of the dispositive issues, will only consider those events which took place in 2007 and 2008, concerning Xu's termination from IFAS IT. Based on this evidence alone, summary judgment must be denied.

---

      [2]The admissibility of past employment practices is an issue better addressed through motions in limine. Thus, the Court will save its determination of the admissibility of such evidence for a later date. For purposes of this Order, such evidence is considered inadmissible.

*A. Gender Discrimination*

Under 42 U.S.C. § 2000e-2(a)(1), employers are prohibited from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." To establish liability under a § 2000e discrimination claim based entirely on circumstantial evidence, a plaintiff must first establish a prima facie case of disparate treatment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). To do this, the plaintiff must show that "'(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job.'" *Cuevas v. Am. Exp. Travel Related Servs. Co.*, 256 Fed. App'x 241, 243 (11th Cir. 2007) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)). Once the plaintiff establishes her prima facie case, the defendant carries the burden of producing some "'legitimate, nondiscriminatory reason'" for the adverse employment decision. *Walker v. NationsBank of Fla. N.A.*, 53 F.3d at 1556 (quoting *Tex. Dept. Of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). Once this burden is carried, the plaintiff, by a preponderance of the evidence, must prove that the employer had a discriminatory intent. *Id.* (citing *Burdine*, 450 U.S. at 256).

In the instant case, the parties agree that Xu "is a woman, she was fired, and she was qualified for her job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). However, the parties disagree "as to whether [Xu] was treated less favorably than similarly situated male employees." *Id.* Thus, at issue is the third prong of Xu's prima facie case. More specifically, since IFAS IT fired Xu but retained Leopold, Doc. 66 ¶ 44, thus treating Xu less favorably than Leopold, the only issue is whether those two employees were similarly situated.

The test in "'determining whether employees are similarly situated for purposes of

establishing a prima facie case'" concerns "'whether the employees are involved in . . . the same or similar conduct.'" *Maniccia*, 171 F.3d at 1368 (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998)).  In the instant case, a reasonable jury could determine that both Xu and Leopold were involved in similar conduct, at least with respect to their positions with IFAS IT.  Each was tasked with managing a network group.  Xu Dep. 27:10-11, 12-14.  Each possessed the title of Systems Program Manager.  Doc. 66 ¶¶ 7, 16.  Moreover, Leopold's job was such that, after about six months of training, Xu could have taken over indefinitely.  Doc. 66 ¶¶ 51-53; Hintz Dep. 13.  Given the similarities of the duties involved in the jobs held by each person, a reasonable jury could determine that the two were involved in similar conduct.  Although a reasonable jury might also determine otherwise, whenever "reasonable minds might differ on the inferences arising from the undisputed facts . . . the court should deny summary judgment." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (quoting *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982)).  Thus, an issue of material fact exists as to whether Xu and Leopold were similarly situated upon Xu's termination.

B.  *Unlawful Retaliation*

Under 42 U.S.C. § 2000e-3(a), "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . . ."  To establish a prima facie case of retaliation, a plaintiff "must show: (1) that [she] engaged in statutorily protected expression; (2) that [she] suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994);

*E.E.O.C. v. Ohio Edison Co.*, 7 F.3d 541 (6th Cir. 1993); *Archuleta v. Colo. Dept. of Insts.*, 936 F.2d 483 (10th Cir. 1991)). Statutorily protected expression "is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors." *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). If plaintiff establishes her prima facie case, then the employer faces the burden of articulating some legitimate, non-retaliatory reason for the adverse employment action. *Pennington v. City of Huntsville*, 261 F.3d at 1266 (citing *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998); *Meeks*, 15 F.3d at 1021). If defendant articulates such a reason, the burden shifts back to plaintiff to prove by a preponderance of the evidence that the employer's reason for the adverse employment action is mere pretext for unlawful retaliatory conduct. *Id.* (citing *Olmsted*, 141 F.3d at 1460).

In the instant case, Xu claims to have engaged in statutorily protected expression by verbally complaining to Cromer, her superior, that his February 29, 2008 evaluation was the product of gender discrimination. *See* Xu Affidavit ¶ 39. UF argues that this alleged conversation, both on its own and in the face of other evidence, is not sufficient to survive summary judgment. Doc. 49, section II.a. To survive summary judgment, Xu must produce evidence such that "a fair-minded jury could return a verdict for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In other words, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Although certain evidence may tend to undermine the credibility of Xu's alleged complaint, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Hunt v. Cromartie*,

526 U.S. 541 (1999) (quoting *Anderson*, 477 U.S. at 255). Thus, in looking at the facts in the light most favorable to the plaintiff, Xu engaged in statutorily protected expression when she complained to Cromer, therein informally voicing her complaint to her superior. *Rollins,* F.2d at 400. As such, Xu has produced sufficient evidence to establish the first element of her prima facie retaliation claim.

As to the second element, adverse employment action may consist of termination. *See Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). In establishing the causal link between the adverse action and the employee's protected activity, "[t]he plaintiff must at least establish that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff." *Id.* (emphasis in original). In this case, Xu suffered an adverse employment action when IFAS IT terminated her employment. IFAS IT first notified plaintiff of her termination on May 5, 2008, through a conversation between Xu and Cromer. Xu Dep. 20:6-8. Prior to that date, Xu verbally complained to Cromer that the February 29, 2008 evaluation was the product of gender discrimination. *See* Xu Affidavit ¶ 39. Thus, Xu has produced evidence tending to show that IFAS IT was actually aware of her protected expression at the time of her termination. As such, there is a genuine issue of material fact as to Xu's prima facie case of retaliation.

C. *The Burden Shifts*

Once Xu has established her prima facie case of either gender discrimination or unlawful retaliation, the burden of production shifts to UF to articulate a legitimate reason for the adverse employment action. *Walker v. NationsBank of Fla. N.A.*, 53 F.3d at 1556; *Pennington v. City of Huntsville*, 261 F.3d at 1266. UF proffers two non-discriminatory, non-retaliatory reasons for Xu's termination. First, UF argues that severe budget cuts forced it to terminate Xu's

employment.  More specifically, by outsourcing only the WAN group, the group Xu managed, IFAS IT would not only save $40,000, but it would also retain control over the LAN group.  Pl.'s Ex. 28; Dr. Joyce Dep. 20:12-21.  Had IFAS IT outsourced both the WAN and LAN groups, it would still have saved $40,000 but would not have maintained control over the LAN group.  Def.'s Ex. 2.  In other words, IFAS IT's decision to outsource only WAN was strictly a business decision, driven not by discriminatory or retaliatory intent, but rather by the goal of saving money while maintaining control.

While this reason may explain IFAS IT's decision to outsource the WAN group over the LAN group, it does not explain why IFAS IT terminated Xu as a result of the transfer.  In evaluating a claim of retaliation or discriminatory termination, "the relevant analysis focuses on why the particular adverse employment action with respect to the particular employee occurred." *Ponce v. Cingular Wireless*, 2005 WL 545213, at *3 (S.D. Fla. Nov. 17, 2005).  In other words, "the choice of who to [fire] still could have resulted from illegal . . . discrimination."  *Id.* Therefore, in order to satisfy its burden of production, UF must present a reason as to why Xu in particular was fired over Leopold.

The University of Florida's human resources department raised similar concerns when it questioned Cromer on his motives in choosing Xu over Leopold.  Doc. 66 ¶ 49.  When questioned, Cromer articulated IFAS IT's second reason for Xu's termination.  UF asserts that while Xu "could have taken a course and learned part of the job . . . she could not have learned the whole job in six months."  Cromer Dep. 124:25-125:5.  In other words, IFAS IT's second legitimate, non-discriminatory, non-retaliatory reason for Xu's termination was that since Leopold was already trained to do his job, and since Xu would struggle to learn the job even in six months, IFAS IT should retain Leopold and terminate Xu.

In evaluating this reason, "a plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11 Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).  Thus, the issue is whether Xu has produced evidence sufficient to convince a reasonable factfinder that IFAS IT's proffered reason is unworthy of credence.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citing *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996)).

Applying these standards to the facts, Xu has produced evidence which casts doubt on the credence of IFAS IT's proffered reason.  For example, after Cromer stated the reason for terminating Xu over Leopold, the University's human resources department never questioned Cromer's justification.  Rather, it took his reason at face value.  *See* Adesogan's Dep. 18).  Given that Xu accused Cromer of gender discrimination just months prior to her termination, the lack of inquiry into his explanation for Xu's termination is highly probative.  That Xu, in fact, could have learned Leopold's job in six months increases this probative value.  Doc. 66 ¶¶ 51-53; Hintz Dep. 13.  On this point, Tom Hintz, former Director of IFAS IT and Xu's supervisor for ten years, stated that "six months is more than adequate time to learn the capability of that" job.  Hintz Dep. 13.  Moreover, although UF terminated Xu, it did not eliminate her job.  On the contrary, it hired a new male employee, James Moore, to perform Xu's WAN duties at CNS.  Pl.'s Ex. 33.  Even though Xu was willing to take a cut in salary to keep the job, Doc. 66 ¶ 66, UF still terminated her employment and hired a male in her place.  Such evidence casts doubt on the credibility of the proffered reason for Xu's termination.  It creates a genuine issue of material fact as to whether this proffered reason is believable as a non-discriminatory, non-retaliatory

explanation.  Thus, summary judgment is inappropriate.

As to her termination, Xu has produced sufficient evidence so as to create prima facie cases of both discrimination and retaliation.  Furthermore, she has produced evidence upon which a reasonable jury could find that IFAS IT's proffered legitimate reason for the termination was nothing more than pretext.  Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1. The motion for summary judgment, Doc. 49, is DENIED.

**DONE AND ORDERED** this   *29th* day of June, 2011

*s/Maurice M. Paul*
Maurice M. Paul, Senior District Judge